# BAGLIN v. SOUTHERN SURETY COMPANY.

PRINCIPAL AND SURETY; BONDS; CONTRACTS.

1. The fact that a surety company was compensated for writing a suretyship obligation does not prevent the court from determining the fair scope and meaning of the contract in the light of the language used and the circumstances surrounding the parties.

2. A surety company is released from liability upon a bond for the return of loaned securities, where the parties to the loan, after ascertaining that the surety company would not execute a bond for the return of money which was originally intended to be loaned, formally changed the subject-matter of the loan to securities, and, after the surety company had executed the bond in the belief that a bona fide loan of securities was involved, entered into supplementary agreements whereby the borrower was to return the face value of the bonds, with interest, in lieu of the return of the bonds. (Citing *Catholic University* v. *Morse,* 32 App. D. C. 195.)

No. 2591. Submitted January 5, 1914. Decided March 2, 1914.

HEARING on an appeal by the plaintiff from a judgment of the Supreme Court of the District of Columbia, on verdict, in an action on a bond.          *Affirmed.*

The COURT in the opinion stated the facts as follows:

This is an appeal from a judgment for the appellee, Southern Surety Company, in the supreme court of the District upon

a second trial held pursuant to the mandate of this court following its opinion in 37 App. D. C. 16, reversing a judgment upon a directed verdict in favor of appellant, plaintiff below.

The action was in debt on a bond, dated July 10, 1907, executed by appellee to George Baglin, appellant, and conditioned for the return, on or before the 25th day of September, 1907, by Garrett B. Linderman to appellant of United States government bonds known as "old 4's," of the par value of $45,000. One of the two counts of the declaration declared upon the obligatory part of the bond, the other sets out the condition also.

The appellee pleaded that it was not indebted to the appellant; that the appellant, Baglin, never loaned Linderman the government bonds to which the undertaking refers; that the undertaking was obtained by means of a fraudulent conspiracy between Linderman and appellant, whereby appellant was to pretend that he had loaned or was to loan Linderman the government bonds described, with the secret agreement between appellant and Linderman, unknown to appellee, that the bonds should not in fact be loaned; that Baglin sold the government bonds within a short space of time, to wit, six hours after his purchase thereof, and appropriated the funds derived from the sale to his own use, to defraud the appellee; that the writing obligatory in suit was executed by the appellee on the faith of the representation that Baglin had loaned Linderman the government bonds, to be returned by Linderman to Baglin, while after the execution of such writing obligatory by the appellee, and without its consent or knowledge, appellant altered and abandoned the agreement between himself and Linderman, for the performance of which the writing obligatory was executed, and entered into a new agreement that he would not expect or require the return of the bonds by Linderman, who thereupon, in the presence of appellant and with his knowledge and consent, converted them into money by sale, forever disabling himself from returning them to appellant, whereby appellee's obligation became extinguished; that after the execution of the obligation in suit, under the circumstances and upon

the conditions above set forth, appellant altered and abandoned the agreement for the performance of which said obligation was executed, and entered into a new agreement with Linderman that the loan of said bonds should be merely fictitious, for the purpose of holding the appellee, and that they should not be actually loaned, but that the appellant should go through the form and appearance of loaning them to Linderman, and that in pursuance of this new agreement appellant and Linderman conspired to defraud appellee by the fictitious tender of the securities by appellant to Linderman, not for the purpose of loaning them, but with the intent and purpose immediately to procure them to be sold, and thereby to obtain from the proceeds of their sale $15,000, which Linderman then owed appellant; that a bona fide loan of the said securities, as contemplated by the terms of the writing obligatory, should never be made, and that by reason of appellant's failure to make a bona fide loan of any securities to Linderman, which was a condition precedent to liability upon appellee's bond, Linderman was without liability to return any bonds to appellant, and no liability on the part of the appellee under its writing obligatory ever accrued; that by the terms of its bond the securities which were to be loaned to Linderman were to be returned by him to appellant on or before September 25th, upon the faith of which representation appellee executed its writing obligatory, and that after its execution appellant and Linderman, without the knowledge or consent of appellee, extended the time for the return of said bonds to the 26th day of September, which extension released appellee from the obligation of its bond; and, finally, that appellant did not lend United States government bonds known as "old 4's" of the par value of $45,000 or any other amount to Garrett B. Linderman, to be returned by him on or before the 25th day of September, 1907, as contemplated in and by the appellee's bond sued upon in this action.

In the first trial of this case the court refused to entertain evidence of fraud on the ground that such a defense could be availed of only in equity, and thereupon directed a verdict for the plaintiff. On appeal to this court the judgment was re-

versed, the court ruling that in the circumstances of this case evidence was admissible to show that the plaintiff never in fact loaned the bonds to the principal obligor, and that the defendant was induced to execute the obligations sued upon by means of a fraudulent conspiracy between the plaintiff and the principal obligor, whereby the former was to pretend to loan the bonds to the latter. The case accordingly was remanded, and at the second trial the only witness who testified was the appellant, Mr. Baglin. At the close of his testimony the court directed a verdict for the appellee.

The facts, as they appear from Mr. Baglin's testimony, are substantially these: Mr. Baglin, throughout this transaction, represented F. Augustus Heinze, the real party in interest. On June 19, 1907, a written contract was entered into between Linderman and Baglin, under which Baglin was to deposit 6,700 shares of United Copper common stock with the Metropolitan Trust Company of New York as collateral to secure a loan of $200,000, upon their promissory note payable September 26, 1907, out of the proceeds of which Baglin was to lend Linderman $75,000 upon Linderman's furnishing a bond by the People's Surety Company guarantying payment of the loan with interest on September 26th. Baglin owned no United Copper stock, the shares to be deposited belonging to Heinze. Fifteen thousand dollars of the $75,000 which Linderman was to receive was advanced to him at the date of this agreement, the additional $60,000 to be paid him when he furnished the surety company's bond. This bond, however, was never furnished, for the reason, as stated to Baglin by Linderman, that no surety company would write a bond for the repayment of money. It will be seen, therefore, that Linderman then had $15,000 of Heinze's money, and that Heinze had no security therefor, nor could any security be obtained in the manner originally contemplated. The question of overcoming this difficulty was discussed freely between Heinze, Linderman, and Baglin, and it was finally suggested by Mr. Linderman "that *we* could get a surety company to give a bond for the return of securities. That was the plan *we* had to get over the difficulty

of procuring a bond for the return of money straight out." It was "for the purpose of getting our money back" that the new plan was adopted. Accordingly the bond in suit was secured of the appellee for the return of $45,000 of the above-mentioned bonds, and one from the Title & Guaranty Company, of Scranton, Pennsylvania, another surety company, for the return of the remaining $30,000 of "old 4's." The material part of the bond in suit reads as follows:

"Whereas: The said George Baglin has loaned, or is about to loan to Garrett B. Linderman, of South Bethlehem, Pennsylvania, United States government bonds, known as old 4's, of the par value of forty-five thousand dollars ($45,000) redeemable after July 1, 1907, and

"Whereas: The said Linderman has promised that he will return to the said Baglin the aforementioned securities on or before September 25, 1907.

"Now, the condition of this obligation is such that if the said Garrett B. Linderman, his heirs, executors, and administrators shall and do return to the said George Baglin, his executors, administrators, and assigns, the said above-mentioned securities, on or before said 25th day of September, 1907, then this obligation shall be void; otherwise to remain in full force and effect.

"Southern Surety Company."

On July 17th, after the bond in suit had been examined by the appellant and was ready for delivery, and before the government bonds had been procured by appellant, a further agreement was entered into between appellant and Linderman, in which it is recited that appellant and Linderman "desire to modify and supplement" said agreement of June 19, 1907; that paragraph 2 of said agreement be modified so that Mr. Baglin, instead of loaning $75,000 cash to Mr. Linderman, shall invest said sum in United States government bonds known as "old 4's," redeemable after July 1, 1907, by purchasing with said sum 75 of such bonds of the par value of $1,000

each, upon being supplied in cash by Mr. Linderman with the excess over $75,000 necessary for the purchase of said bonds and the payment of commissions upon such purchase. Paragraph 2 of said agreement was further supplemented by providing that Baglin should forthwith loan to Linderman said $75,000 worth of bonds upon the repayment of the $15,000 previously advanced by Baglin to Linderman, and Linderman agreed to return to Mr. Baglin, on September 26, 1907, "said United States government bonds, or others of the description and par value above referred to." Paragraph 3 of said agreement was modified so that Mr. Linderman should furnish, contemporaneously with said modified agreement, a bond or bonds in form satisfactory to Mr. Baglin, and executed by a surety company or surety companies satisfactory to him, "conditioned for the return on September 26, 1907, of the United States government bonds of the description and par value referred to."

After the execution of said modified agreement, and while Baglin and Linderman were waiting for the delivery to Baglin by Heinze's broker of the "old 4's" that had been purchased to carry out the transaction, a second supplemental agreement was entered into between Baglin and Linderman, in which it is set forth that "Mr. Baglin also represents hereby to Mr. Linderman that it is his desire and intention at the time when said bonds would be returnable pursuant to the aforementioned agreements, to accept from Mr. Linderman the face value of said bonds in cash, with interest at 6 per cent in lieu of the return of the bonds themselves." This second supplemental agreement was made at Linderman's request, "because," says Mr. Baglin, "he was not willing to sell the bonds without something in writing to show that I was willing he should sell them." Forty-five "old 4's" of the par value of $42,950 were then secured on said July 17th. Thereupon Linderman and Baglin went into the Mercantile National Bank, of which Heinze was president and a Mr. Klein cashier. Baglin introduced Linderman to Klein and Linderman handed Klein the "old 4's," with request to pay him, Linderman, $30,000, and to pay Baglin

the remaining $12,950, the same being on account of the $15,000 loaned him in June. Klein accordingly paid Linderman the $30,000 on that date and later the remaining proceeds to Baglin, there still remaining due $2,050 to Baglin. Later, on July 25th, "old 4's" to make up the deficiency were obtained, when the same process was gone through of delivering to Linderman and accompanying him to Klein, who cashed them and gave Baglin the proceeds as payment in full of the balance due on the $15,000 promissory note.

It is perfectly apparent from the testimony of Mr. Baglin that he knew, as did Heinze and Linderman, that no surety company would "knowingly give a bond for the return of cash;" that Linderman had informed him "that no surety company would give a bond if it knew it was going to be held for the return of cash." Mr. Baglin further testified: "It is absolutely true that I bought the bonds through a broker, gave them to Linderman, knowing he would sell or redeem them, taking them to the cashier and having them sold and then getting the money for the same amount I paid for the bonds, instead of lending him the money outright, because I knew he could not get an undertaking for the return of cash; * * * I think I did understand from the beginning, after I knew he could not give a surety bond to pay money, that these bonds (government 4's) were to be gotten in the way described and then redeemed, and the money gotten in that way. * * * I testified at the former trial, and it is true, that we went through this roundabout proceeding because we wanted to get the surety company's bond technically binding on them. * * * The bonds stayed in Linderman's hands about five minutes or so after he got them." The witness was asked in cross-examination why money was not loaned straight out to Linderman, and answered: "Because the surety company would not give an obligation for that."

*Mr. Dean Emery* and *Mr. A. S. Worthington* for the appellant.

*Mr. R. S. Huidekoper* and *Mr. J. J. Darlington* for the appellee.

Mr. Justice Robb delivered the opinion of the Court:

At the outset it may not be amiss to direct attention to the fact that it was perfectly competent for these parties to enter into such a contract as should be mutually acceptable. The surety company was under no duty to enter into an agreement for the return of money. It might, if it so desired, *limit its obligation to the return of securities* actually, and not fictitiously, loaned to Linderman. Many reasons might be suggested why the company should have been unwilling to enter into the kind of a contract that Baglin and Linderman first desired. But that is quite unnecessary, because, in the circumstances of this case, the limitation in the contract as written is necessarily material. It has been made so by the parties. If an insurance company may require, as a condition to the validity of a policy issued by it, the giving of notice of any prior or subsequent insurance. (*Northern Assur. Co.* v. *Grand View Bldg. Asso.* 183 U. S. 308, 46 L. ed. 213, 22 Sup. Ct. Rep. 133), so may a surety company insist upon the performance in good faith of the very condition upon which it was induced to enter into its contractual obligation. Baglin and Linderman knew that the surety company would not knowingly enter into an obligation for the return of money, but would guarantee the return of loaned securities. They knew, therefore, that if an obligation was to be obtained from the surety company it would have to be based upon a bona fide *loan* of securities in the ordinary and usual acceptation of that term. The contract actually entered into gave effect to the understanding of the parties, for it sets forth the loaning to Linderman by Baglin of "old 4's" of the value of $45,000, and that these "aforementioned securities" are to be returned on or before a date certain.

Knowing that the contract of suretyship had been entered into by the surety company upon the express condition that there should be a *loan* merely of said bonds to Linderman, Baglin, before he delivered them to Linderman, entered into the supplemental agreements whereby the character of the trans-

action was entirely changed. It was no longer a loan of securities,—it was in substance and effect a loan of money. By these supplemental agreements Linderman became a mere debtor of Baglin. In other words, their relations under the supplemental agreements were such that, had the facts been seasonably known to the surety company, its undertaking would not have been executed. Appellant knew all this, and now boldly asserts that this "roundabout proceeding" was resorted to in order to obtain a contract from the surety company that it would not otherwise have written. Such a transaction ought not to be countenanced in a court of justice. The surety company ought not to be held to the fulfilment of a contract into which it expressly declined to enter. The fact that it was compensated for writing the suretyship obligation does not prevent us from "determining the fair scope and meaning of the contract in the light of the language used *and the circumstances surrounding the parties.*" (Italics ours.) *United States use of Hill* v. *American Surety Co.* 200 U. S. 197, 50 L. ed. 437, 26 Sup. Ct. Rep. 168. We rule, therefore, that the supplemental agreements of July 17th so modified and changed the original contract between the parties, the contract upon which the suretyship undertaking was based, as to release the surety company. *Miller* v. *Stewart,* 9 Wheat. 680, 6 L. ed. 189; *United States Fidelity & G. Co.* v. *Goldin Pressed & Fire Brick Co.* 191 U. S. 416, 423, 48 L. ed. 242, 245, 24 Sup. Ct. Rep. 142; *Catholic University* v. *Morse,* 32 App. D. C. 195.

This ruling renders it unnecessary to consider the other questions suggested.

Judgment affirmed, with costs.              *Affirmed.*